# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Safco Products Co.,                                      Civil No. 08-4918 (SRN/JJG)

        Plaintiff,

    v.                                              **MEMORANDUM OPINION
                                       AND ORDER**

Welcom Products, Inc., John Evanthes,
Kerry Welsh, and Yan Jian Shunhe
Industrial Co., Ltd.,

        Defendants.

---

Felicia J. Boyd, and Aaron A. Myers, Barnes & Thornburg LLP, 225 South Sixth Street, Suite 2800, Minneapolis, MN 55402, for Plaintiff.

Dennis C. Bremer, and James R. Hietala, Carlson, Caspers, Vandenburgh & Lindquist, 225 South Sixth St., Suite 3200, Minneapolis, MN 55402; and Willmore F. Holbrow, III, Blakely, Sokoloff, Taylor & Zafman, LLP, 12400 Wilshire Blvd., Suite 700, Los Angeles, CA 90025, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff Safco Products Co.'s motion for summary judgment (Doc. No. 161), Plaintiff's motion to exclude testimony and opinions (Doc. No. 157), and Defendant Welcom Products, Inc.'s motion for summary judgment (Doc. No. 166).  For the reasons stated below, this Court grants in part and denies in part Safco's summary judgment motion, grants in part and denies in part Plaintiff's motion to exclude testimony and opinions, and grants in part and denies in part Welcom's summary judgment motion.

## I.      FACTUAL AND PROCEDURAL SUMMARY

In this design patent action, Safco, the current patent holder, seeks summary judgment of infringement against the foreign manufacturer, Defendant Yang Jian Shunhe Industrial Co.,[1] and the domestic seller, Defendant Welcom Products, Inc., a California corporation, of the accused product, the "Magna Cart MCX" pushcart.  Welcom has asserted an invalidity defense of non-joinder of an inventor and a Lanham Act counterclaim.

Many of the facts are disputed, but this much is clear.  Safco is the current owner of U.S. Patent No. D522,708 (the '708 patent), having acquired it by assignment from Thaler International Co., Ltd., a Taiwanese company, in November 2007.  The '708 patent originally issued on June 6, 2006 with Shih-Fang (a/k/a "Marvin") Chang identified as the sole named inventor, and Thaler, a company established in 1996 by Chang and his father, identified as the assignee.  (Doc. No. 1-1.)

As a design patent, the '708 Patent claims "[t]he ornamental design for a pushcart, as shown."  (Id.)  The specification consists of seven figures, showing seven different views of the pushcart.  (Id.)  Safco uses the patented design in its model 4049 pushcart, which is marked with a notice of the '708 patent.  Safco asserts its pushcarts are made in Taiwan and labeled accordingly.

Welcom sells various models of the "Magna Cart" pushcart, including the allegedly-infringing "MCX" version.  Welcom acquires its pushcarts from Defendant

---

[1]      It appears that Defendant Yang Jian Shunhe Industrial Co., Ltd., which is a Chinese company, has not been served with the Complaint.

Yang Jian Shunhe Industrial Co. ("Shunhe"), a Chinese manufacturing company. Shikun

Jian is an engineer and the founder of Shunhe. Jian has designed and developed many

different pushcarts for manufacture by Shunhe and sale by various entities worldwide.

The parties then part ways. Safco asserts that Marvin Chang's father designed

Safco's model 4062 "Stow Away" (a/k/a "TP-2") pushcart and that Thaler selected

Shunhe to manufacture that cart, which Shunhe designated the FW-90B model. Based on

the needs of the market, however, Safco also wanted to sell a smaller pushcart and asked

Thaler to develop a pushcart similar to Wesco's "Mini Mover" pushcart. Safco claims

that "Chang used the Wesco cart and the model 4062 cart as references to design" the

new cart for Safco, which was eventually sold as the model 4049. (Doc. No. 163, at 5.)

Chang essentially claims he fully conceived of the design and then asked Jian only

to implement it, such that conception was complete before Chang contacted Jian and,

thus, any contributions by Jian would not be patentable. (Doc. No. 163, at 6 ("Chang was

very specific in his direction to Jian for the new Safco cart design."); id. at 9 ("Chang met

with Jian and finished conveying the design to Jian so that Shunhe could create the

production drawings. In October 2003, Shunhe created proposed production drawings

capturing Chang's ideas and faxed them to Chang. . . . Chang approved [by phone] the

drawings incorporating Chang's design.").) In short, Safco contends that Jian's

contribution is confined to assisting with the production drawings for what Thaler then

had manufactured and sold as the 4049 pushcart–which Safco maintains are manufactured

not by Shunhe in China, but rather in Taiwan–but that such contribution does not rise to

the level of inventorship, or even co-inventorship.  Moreover, Safco argues that because

Jian thus had access to that design, he essentially stole Safco's intellectual property and

used it to manufacture the Magna Cart MCX pushcart for Welcom.

Welcom, however, contends that Chang simply told Jian that he wanted a  smaller

version of the 4062, just a pushcart similar to the Wesco Mini Mover.  Jian testified that

he designed and manufactured what he designates as the FW-90S pushcart, and what

Thaler and Safco sell as the 4049 model, and what Welcom sells as the Magna Cart

MCX.  Jian testified that his company, Shunhe, manufactured many pushcarts of various

models for Thaler and Safco until 2008, when this litigation began and Chang allegedly

asked Jian to not sell pushcarts to Welcom anymore.

Moreover, Jian testified that he asked Chang to apply for a U.S. patent on that

design–with Jian named as sole inventor–as he had done with other customers to obtain

Japanese and German patents on various pushcart designs.[2]  Shunhe thus marked the FW-

90S pushcarts it manufactured with notice that patent applications in the U.S. were

pending as well as notice of the Chinese utility and design patents Jian obtained.  Jian

testified that he did not learn that Chang had in fact applied for what issued as the '708

patent in Chang's own name as sole inventor until sometime after it issued.

Having acquired the '708 patent from Thaler for $1.00 in November 2007, Safco,

---

[2]     Jian has numerous Chinese patents as well as some issued by foreign
countries other than the United States.  The '708 patent is Chang's sole patent from any
country.  Safco argues that Chinese patents are essentially "junk" in terms of what the
relevant Chinese patent office requires of a patent applicant, and the resulting value of
any issued patent.  This Court understands that the U.S. patent system differs from that of
other countries such as China.

as patentee by assignment, filed this infringement action on August 12, 2008.  Welcom

raised an invalidity defense based on the alleged failure to name Jian as the true inventor

(or at least a co-inventor).[3]  Welcom also asserted a counterclaim under the Lanham Act,

alleging that Safco's pushcarts are not in fact manufactured in Taiwan, but rather

originally emanate from China, and that Safco uses Taiwan solely as a shipping

intermediary in order to evade a substantial U.S. tariff, imposed in December 2004, on

most pushcarts manufactured in China.[4]

Safco, as the current patent holder, now moves for summary judgment of

infringement and on Welcom's Lanham Act counterclaim for false designation of origin.

(Doc. No. 161.)[5]  Welcom moves for summary judgment of invalidity under 35 U.S.C. §

_____

[3]     Safco contends that the inventorship defense has changed or shifted from a
claim of invalidity due to derivation to one of non-joinder or co-inventorship, and thus
asks this Court to award it summary judgment on the allegedly-abandoned derivation
defense.  (Doc. No. 191, at 2 n.2.)  Safco argues that "WelCom does not claim derivation
[anymore] and, therefore, necessarily concedes that Chang is <u>an</u> inventor."  (<u>Id.</u> at 3.)  But
a derivation claim is one type of an inventorship defense and it is not clear, even
assuming that Defendants initially raised only derivation, that they have now abandoned
it in favor of a different type of inventorship challenge.  (<u>See</u> Doc. No. 181, at 4 (arguing
that Chang "has simply hijacked Mr. Jian's invention by taking credit for Mr. Jian's work
product"); Doc. No. 166, at 2 (arguing that "Jian is at least a co-inventor, and indeed, is
the sole inventor, of the handcart shown in the '708 patent").)

[4]     In addition, Welcom had asserted affirmative defenses and a counterclaim
that the '708 patent was invalid as obvious and anticipated.  (Doc. No. 44, ¶¶ 25-26, & at
5.)  Welcom also asserted the affirmative defenses of laches, equitable estoppel and
waiver.  (<u>Id.</u> ¶ 24.)  Finally, Welcom claimed the patent is unenforceable due to
inequitable conduct.  (<u>Id.</u> ¶ 28.)

[5]     Safco seeks an "order that the patent in suit is *valid*, infringed, and
enforceable."  (Doc. No. 161 (emphasis added).)  But a court does not declare an issued
patent "valid."  <u>Stratoflex, Inc. v. Aeroquip Corp.</u>, 713 F.2d 1530, 1534 n.3 (Fed. Cir.

(continued...)

102(f) for failure to identify all true inventors and, in the alternative, for summary

adjudication of co-inventorship, thereby also requesting a claim construction.  (Doc. No.

166.)  Finally, Plaintiff moves to exclude the testimony and opinions of two of Welcom's

expert witnesses.  (Doc. No. 157.)

## II.    DISCUSSION

Plaintiff frames the case in terms of infringement, as it would appear that the '708

patent plainly reads on the allegedly-infringing product and Defendants concede as much.

In fact, as an isolated question of pure infringement, this Court would not dispute that the

issue would be appropriate for summary adjudication.  But the resolution of that question

must await a determination of the underlying issue of inventorship, as Jian, the designer at

Defendant Shunhe, claims to have invented, or at least co-invented, the subject matter of

the '708 patent, such that the '708 patent should be declared invalid for non-joinder.  See

---

[5](...continued)

1983).  Rather, an issued patent enjoys a presumption of validity, and this rebuttable
presumption may be challenged after issuance.  A successful challenge would result in a
judgment of invalidity, but an unsuccessful challenge results only in a decision that the
patent, on the record of that particular challenge, is not invalid–that the alleged infringer
did not meet its burden of proving invalidity–such that others may challenge the patent in
the future.  Id.  Safco's motion also seeks summary judgment on Welcom's defenses and
counterclaim that the '708 patent is invalid and unenforceable for obviousness and
anticipation.  (Doc. No. 163, at 22.)  Welcom now states that it is no longer pursuing the
invalidity defenses of obviousness or anticipation.  (Doc. No. 181, at 28.)  Rather,
Welcom's invalidity defense is now limited to the issue of inventorship, asserting that
Jian was at least a co-inventor, if not the sole inventor, of the design claimed in the '708
patent.  (Id. at 4.)  Safco further seeks summary judgment on Welcom's claim that the
'708 patent is unenforceable based on inequitable conduct.  (Doc. No. 163, at 33-34.)
Finally, Safco seeks summary judgment on Defendants' affirmative defenses of laches,
equitable estoppel and waiver.  (Id. at 43-44.)  As Safco notes, Defendants, having
offered no response on those issues, apparently concede that summary judgment is
appropriate on those defenses.  (Doc. No. 191, at 1 n.1.)

35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless– . . . (f) he did not himself invent the subject matter sought to be patented.").  Moreover, the inventorship question must also be addressed first because Welcom's counterclaim under the Lanham Act–contending that Safco's pushcart is not in fact manufactured in Taiwan, but rather in China by Shunhe–is enmeshed in the overall inventorship dispute.

Safco relies heavily on the principle that an issued patent is presumed valid, and that the burden of demonstrating otherwise entails a "clear and convincing" evidence standard.  True enough as a matter of law.  The presumption of validity accorded an issued patent requires one challenging inventorship as named in the patent to prove by clear and convincing evidence that the named inventor is not the true and sole inventor.  Nartron Corp. v. Schukra U.S.A., Inc., 558 F.3d 1352, 1356 (Fed. Cir. 2009) ("[A] party alleging non-joinder [of a co-inventor in a patent infringement suit] 'must meet the heavy burden of proving its case by clear and convincing evidence.'").

Safco seems to argue, however, that this heightened standard of proof somehow evades the applicable summary judgment standard–in effect, that to defeat *Safco's* motion for summary judgment of infringement, Defendants must now *prove* invalidity by clear and convincing evidence.  (Doc. No. 179, at 2 (contending that the burden is on Welcom "to demonstrate **by clear and convincing evidence** that somebody other than Chang invented the claimed design" (emphases in original)).)  Accordingly, the Court turns to the nuances of that standard in the present procedural context.

### A.     Summary Judgment Standard

To defeat a motion for summary judgment, the non-movant must show that there is a "genuine dispute as to any material fact" and that the movant is not "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (as amended December 1, 2010). The Federal Circuit has recognized, under the Supreme Court's guiding precedent, that "[w]hen evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits." Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

> Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity *so that no reasonable jury could find otherwise*. Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense *upon which a reasonable jury could invalidate the patent*.

Id. (emphases added).[6]

Accordingly, the party challenging validity need not, in order to defeat the patentee's motion for summary judgment, conclusively prove invalidity by clear and convincing evidence. Rather, it need identify genuine issues of material fact that, if later proved at trial, could satisfy that heightened standard. But where the alleged infringer

---

[6]     There seems to be no dispute that Welcom, in order to prevail on *its* motion for summary judgment, would have to prove, by clear and convincing evidence, that there is no question of fact that the true inventor, or a co-inventor, was omitted from the '708 patent. But the parties disagree over other aspects of patent law, including whether Safco as well as Welcom would have to corroborate the testimony of their respective "claimed" inventors.

moves for summary judgment of invalidity, it must, in order to prevail on that motion, submit evidence that is not only clear and convincing, but also free of any question of material fact.

But this is not to say that the presumption of validity, and its attendant clear-and-convincing standard of proof of invalidity, "increases the difficulty of showing an absence of material fact" on a motion for summary judgment by the alleged infringer on the ground that the patent is invalid.  D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1147 (Fed. Cir. 1983) (further stating that it does not mean that "the presumption 'has little or no effect' when the challenger presents [invalidity] evidence that was not before the Patent and Trademark Office").  Rather, once the party challenging validity presents evidence of such, "countervailing evidence [of validity] must necessarily come from the patentee.  To defeat a motion for summary judgment, a patentee need not prove [validity], but must submit facts indicating an ability to come forward with evidence that such proof is possible."  Id. at 1150 (noting that because the alleged infringer "established a *prima facie* case, it fell to [the patentee] to submit evidence, by affidavit or otherwise, setting forth specific facts raising a genuine issue for trial").

In short, whether the ultimate quantum of proof is a mere preponderance of the evidence or clear and convincing evidence, that fact does not change the general summary judgment framework that the non-movant must only raise a genuine issue of material fact, such that it could prevail later at trial under the applicable standard, be it a preponderance of the evidence or clear and convincing evidence.  And "[i]n determining whether a

genuine issue of material fact exists, the court views the evidence in the light most

favorable to the nonmoving party and resolves all doubts in its favor." <u>Eli Lilly and Co.</u>,

251 F.3d at 962.[7]

### B.   Design Patents

At issue here is a design patent, not a utility patent.  By definition, a utility patent

encompasses "any new and useful process, machine, manufacture, or composition of

matter." 35 U.S.C. § 101.  In contrast, a design patent claims ornamental features of an

article.  <u>Id.</u> § 171 (authorizing design patent for "any new, original and ornamental design

for an article of manufacture").  As the Federal Circuit has emphasized, a "design patent

only protects the novel, ornamental features of the patented design." <u>Oddzon Products,</u>

<u>Inc. v. Just Toys, Inc.</u>, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

Thus, whereas a utility patent often includes a substantial textual specification

culminating in various claims delineating the elements of the invention, a design patent is

often little more than figures–various pictures of the entire article incorporating the

---

[7]      Safco claims that Defendants are "using Rule 56 as a crutch, arguing that
the court is required for summary judgment purposes to assume the truth of Jian's
testimony and the authenticity of his documents."  (Doc. No. 191, at 4.)  Safco further
contends that Defendants cannot meet their burden under the clear and convincing
standard "merely by arguing that the Court should adopt inferences in favor of its witness,
Jian, rather than Chang."  (<u>Id.</u> at 4-5.)  The Court understands the operation of Rule 56
and, in particular, that it is not this Court's present function to decide disputed facts in
favor of either party.  Moreover, the Court recognizes that on a summary judgment
motion, the non-movant is entitled to inferences in its favor.  But the Court also observes
that the two cases on which Safco relies for its argument regarding inferences were not
decided on summary judgment, but rather after a bench trial on inequitable conduct.  <u>Star</u>
<u>Scientific, Inc. v. R.J. Reynolds Tobacco Co.</u>, 537 F.3d 1357, 1366 (Fed. Cir. 2008);
<u>Scanner Tech. Corp. v. ICOS Vision Systems</u>, 528 F.3d 1365, 1376 (Fed. Cir. 2008).

claimed design.  In fact, "[i]t is the drawings of the design patent that provide the description of the invention."  In re Daniels, 144 F.3d 1452, 1456 (Fed. Cir. 1998).  In essence, a patented design reflects a particular (and novel), non-functional *appearance* of an article.  Keystone Retaining Wall Sys. v. Westrock, Inc., 997 F.2d 1444, 1450 (Fed. Cir. 1993).

Here, for example, the sole claim of the '708 patent is "[t]he ornamental design for a pushcart, as shown."  (Doc. No. 1-1.)  The "description" then simply references the seven figures which constitute the remainder of the patent.  (Id.)  As the Federal Circuit succinctly stated, "[d]esign patents have almost no scope."  In re Mann, 861 F.2d 1581, 1582 (Fed. Cir. 1988).  In every case of a design patent, the claimed subject matter "is limited to what is shown in the [patent] drawings."  Id.

But the ornamental design is often just a part of the overall article that usually also involves functional elements.  And "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."  Oddzon, 122 F.3d at 1405.

Any pushcart is, at a minimum, plainly a functional article.  But even where a pushcart involves more than purely functional elements, the patentable "design" of a pushcart presumably cannot be represented in a figure that does not also display the pushcart as a whole.  Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1370-71 (Fed. Cir. 2006) (clarifying, in infringement action involving a design for a bed with various ornamental features, "that it is the overall 'bed frame' that is patented–not

just the details of its ornamentation").  The patented design at issue here includes various

ornamental elements, but is represented in the various figures of the '708 patent, all of

which generally display a pushcart incorporating the design from different views.  But the

ornamental aspects must be distinguished from the functional aspects of the article.  For

example, the top handle of any pushcart is functional, but might also include ornamental

features.

Moreover, where the design includes multiple, separate elements of ornamentation,

the claim must be viewed as the total of such ornamental elements in their entirety.

Amini Innovation Corp., 439 F.3d at 1370-71 ("'A design patent protects the non-

functional aspects of any ornamental design as seen as a whole and as shown in the

patent.'"); see Crocs, Inc. v. ITC, 598 F.3d 1294, 1304 (Fed. Cir. 2010) (observing that

claim construction must not focus on "particular features" of the claimed design as

opposed to "consideration of the design as a whole"); Oddzon, 122 F.3d at 1405 ("It is the

appearance of a design as a whole which is controlling in determining infringement.").[8]

Thus, all of the novel ornamental aspects of the design must be viewed together as a

---

[8]     The Federal Circuit recently abandoned the "point of novelty" test that had
been used in determining whether an accused product infringed a patented design in favor
of the "ordinary observer" test.  Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679
(Fed. Cir. 2009) (en banc).  The point of novelty test required that the accused article
appropriate the novelty in the patented device that distinguishes it from the prior art.  Id.
at 670-71.  The Federal Circuit rejected that test as it proved "difficult to apply where the
claimed design has numerous features that can be considered points of novelty, or where
multiple prior art references are in issue and the claimed design consists of a combination
of features, each of which could be found in one or more of the prior art designs."  Id. at
671.  Thus, the proper test for infringement of a design patent is "whether the accused
design has appropriated the claimed design as a whole."  Id. at 677.

single invention.

This is not to say, however, that only one inventor could conceive of the invention, or that the same inventor must have conceived of each of the various ornamental elements.  In cases of co-inventorship, one inventor might conceive of a particular ornamental feature, while another might separately conceive of a different ornamental feature.

### C.    Claims Construction

In framing the dispute as a clear-cut case of infringement appropriate for summary judgment, Safco first contends that no formal claim construction is necessary or proper. Granted, "[g]iven the recognized difficulties in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to construe a design patent claim by providing a detailed verbal description of the claimed design." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2009) (en banc).  But Egyptian Goddess concerned infringement, not inventorship.[9]

---

[9]    Moreover, it is clear that "[d]esign patent infringement is [still] a question of fact, which a patentee must prove by a preponderance of the evidence." Oddzon Products, Inc. v. Just Toys, Inc., 122 F.3d 1296, 1405 (Fed. Cir. 1997).  And "[w]hether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." Id. at 1404. "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." Id. at 1405, quoted in Egyptian Goddess, Inc., 543 F.3d at 680. Egyptian Goddess did not negate the need, as discussed in Oddzon, to construe the claims of a design patent that includes functional elements. Richardson v. Stanley Works, Inc., 597 F.3d 1288, 1294 (Fed. Cir. 2010) ("A claim to a design containing numerous functional elements, such as here, necessarily mandates a narrow construction.  Nothing in our *en banc* Egyptian Goddess opinion compels a different outcome.").

An analysis of inventorship involves two steps.  First, there must be "a construction of each asserted claim to determine the subject matter encompassed thereby." Trovan, Ltd., 299 F.3d at 1302.  Second, the court must then compare "the alleged contributions of each asserted co-inventor with the subject matter of the properly construed claim to then determine whether the correct inventors were named." Id.; see Ethicon, 135 F.3d at 1461 (stating that to determine whether an allegedly omitted inventor contributed to the conception of the subject matter of the relevant claim, one must first "determine what [the alleged co-inventor's] contribution was and then whether that contribution's role appears in the claimed invention").

Thus, claim construction of some form is necessary and unavoidable here in order to identify the ornamental elements of the design as distinguished from the functional aspects of the pushcart.  The question then becomes what is the patentable design claimed by the '708 patent and who conceived of it.  More precisely, the question is which individual or individuals "conceived" of the claimed invention, that is, which individual came up with the mental idea of the particular elements of the ornamental subject matter represented in the figures.

In other words, this Court must construe the claim to know what precisely is claimed as the invention, particularly with respect to a design patent that discloses the claimed subject matter in figures of a tool that has functional as well as ornamental aspects.  Trovan, Ltd. v. Sokymat SA, 299 F.3d 1292, 1304 (Fed. Cir. 2002) ("[A]n independent claim construction analysis . . . is the first step in determining

inventorship."). Accord Eli Lilly and Co. v. Aradigm Corp., 376 F.3d 1352, 1360 (Fed. Cir. 2004) ("[T]he legal scope of a claim must be known before the contributions of an alleged co-inventor can be compared with that claim to determine whether the correct inventors were named."); Ethicon, 135 F.3d at 1460 ("[T]he critical question for joint conception is who conceived . . . the subject matter of the claims at issue.").

As noted above, the disclosure of the claimed subject matter of a design patent often involves no written description, only pictorial figures. See 37 C.F.R. § 1.153(a) ("No description, other than a reference to the drawing, is ordinarily required."). The figures of the '708 patent disclose, based on this Court's independent assessment, several ornamental features of the pushcart, from top to bottom:  (1) the dual scalloped handles, with the curved dual scalloped shape of the lower handle mirroring the curved scallop shape of the upper handle; (2) the textured appearance of the center portion of the top scalloped handle; (3) a crossbar with a rearward bowing configuration with tapering ends by the vertical uprights of the pushcart; (4) a bottom brace featuring visually prominent exposed fasteners with corresponding recesses for the rear ends of the fasteners, "S" shaped sloped shoulders, and a horizontal lower region curved upward at the ends to form an elliptical aperture; and (5) a particular pattern of openings in the toe plate.[10]

---

[10]    The parties' proposed experts differ somewhat in their analyses of what constitutes the novel ornamental subject matter of the '708 patent.  (Safco has moved to exclude the testimony of Dr. Arthur G. Erdman, Welcom's expert on what is an ornamental feature as opposed to a functional feature.  See infra section II.L.)  Safco's expert, Robert Anders, asserts that the ornamental aspects of the '708 patent include (1) the toe-plate pattern; (2) the contrasting center portion of the top handle; (3) the cross-bar; (4) the fastener pattern; and (5) the S-shape of the shoulders.  (Doc. No. 167, at 9-10.)

(continued...)

This Court is aware that the Federal Circuit has cautioned district courts about the risks of articulating a textual construction of a design claim.  Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679-80 (Fed. Cir. 2008).  But the Federal Circuit's concern focused on infringement, particularly whether the fact-finder's focus on one (or fewer than all) of the design elements would distort the proper analysis of whether an accused article infringed the overall design as claimed in the patent.  Id.  This Court does not reach the issue of infringement today.  Rather, in addressing the issue of an omitted inventor, particularly where the elements of alleged ornamental novelty are essentially independent (for example, the shape of the top handle is unrelated to the visual prominence of the fasteners, such that each element could be incorporated or not incorporated in any particular pushcart design without regard to whether other elements were incorporated), the focus on independent elements of the design is necessary to determine who invented what–which inventor or alleged inventor contributed to the conception of any particular design element.

---

[10](...continued)
Dr. Erdman, contends that the '708 patent discloses six ornamental design elements:  (1) the small triangle toe-plate pattern; (2) the "dual scallop" shape of the handle; (3) the contrasting central portion of the top-most handle; (4) the prominent fastener design; (5) the ("filleted") crossbar; and (6) the bottom support structure.  (Doc. No. 167, at 9 (citing Ex. 202).)  Although Erdman's review of the shape of the shoulders was inconclusive, Welcom agrees with Safco's expert that the shoulder shape is ornamental.  (Id. at 10.)  The Court notes that even though some of these ornamental features might at first appear to be driven by functional considerations, the Court has endeavored to differentiate the truly ornamental features from the functional aspects of the pushcart.  Moreover, the PTO issued the design patent, there is no invalidity defense of functionality and the parties' experts substantially agree on the ornamental features of the pushcart.

D.      **Inventorship**

The validity of a design patent is measured by the same tests that apply in determining the validity of a utility patent.  Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d 1423, 1440 (Fed. Cir. 1984).  And the same standard of inventorship applies to design patents as it does to utility patents.  Hoop v. Hoop, 279 F.3d 1004, 1007 (Fed. Cir. 2002).  A patented invention may, of course, reflect the conceptual contribution of two or more joint inventors.  Ethicon, Inc. v. United States Surgical Corp., 135 F3d 1456, 1460 (Fed. Cir. 1998).  But "[b]ecause '[c]onception is the touchstone of inventorship,' each joint inventor must generally contribute to the conception of the invention."  Id.

> "Conception is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'"  An idea is sufficiently "definite and permanent" when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."

Id. (internal citations omitted).  Although the "conceived invention must include every feature of the subject matter claimed in the patent," "for the conception of a joint invention, each of the joint inventors need not 'make the same type or amount of contribution' to the invention.  Rather, each needs to perform only a part of the task which produced the invention."  Id.

But once conception is complete, "one does not qualify as a joint inventor by merely assisting the actual inventor."  Id.  For example, "[o]ne who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint

17

inventor." Id.

While "[i]nventorship is a question of law," it is "based on underlying facts." Univ. of Pittsburgh v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009) (citing Hybritech Incorporated v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986) ("Findings of fact supporting that legal conclusion are, of course, reviewed under the clearly erroneous standard.")). Thus, the existence of genuine issues of material fact regarding inventorship may preclude summary judgment. E.g., New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992).

### E.   Rebutting the Presumption of Validity:  Clear and Convincing Evidence and Corroboration

Once issued, a patent enjoys a presumption of validity, including "that the named inventors are the true and only inventors." Ethicon, Inc. v. United States Surgical Corp., 135 F3d 1456, 1460 (Fed. Cir. 1998).  An omitted co-inventor "must prove their contribution to the conception of the claims by clear and convincing evidence." Id. at 1461.  "The 'clear and convincing' standard is an intermediate standard which lies somewhere in between the 'beyond a reasonable doubt' and the 'preponderance of the evidence' standards of proof." Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007).  "Although an exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." Id.

But the alleged co-inventor's "testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone," satisfy the clear and

convincing standard.  Ethicon, Inc., 135 F3d at 1461.  Rather, corroboration is required,

and "[w]hether the inventor's testimony has been sufficiently corroborated is evaluated

under a 'rule of reason' analysis," under which "'[a]n evaluation of *all* pertinent evidence

must be made so that a sound determination of the credibility of the [alleged] inventor's

story may be reached.'"  Id.

> Corroborating evidence may take many forms.  Often
> contemporaneous documents prepared by a putative inventor serve to
> corroborate an inventor's testimony.  Circumstantial evidence about the
> inventive process may also corroborate.  Additionally, oral testimony of
> someone other than the alleged inventor may corroborate.

Id. (internal citations omitted).

"The presumption acts as a procedural device which places the burden of going

forward with evidence and the ultimate burden of persuasion of invalidity at trial on the

alleged inventor."  New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882

(Fed. Cir. 1992).  Thus, the party challenging validity "not only has the procedural burden

of proceeding first and establishing a prima facie case, but the burden of persuasion on

the merits remains with that party until final decision."  Stratoflex, Inc. v. Aeroquip

Corp., 713 F.2d 1530, 1534 (Fed. Cir. 1983).  But once the party asserting invalidity

makes that prima facie showing, the patentee must introduce sufficient evidence to rebut

the prima facie showing.  Id.  Accord Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d

1570, 1573 (Fed. Cir. 1985) ("If this burden is met, the party relying on validity is then

obligated to come forward with evidence to the contrary.").

But this does not mean that the presumption of validity disappears or even is

weakened.  Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1562 (Fed. Cir.

1988) ("Where a challenger does put in evidence disputing validity, the presumption of

validity is neither eliminated nor undermined by the challenger's evidence."), abrogated

on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008)

(discarding "point of novelty" test for infringement of design patents).  "While a patentee

may have the burden of going forward with rebuttal evidence once a challenger has

presented a *prima facie* case of invalidity, the presumption of validity remains intact and

the ultimate burden of proving invalidity remains with the challenger throughout the

litigation."  Innovative Scuba Concepts, Inc. v. Federal Industries, Inc., 26 F.3d 1112,

1115 (Fed. Cir. 1994).  The introduction of evidence of invalidity simply means that the

"party asserting invalidity . . . would be more likely to carry the burden of persuasion

imposed by section 282."  Jervis B. Webb Co. v. Southern Systems, Inc., 742 F.2d 1388,

1392 (Fed. Cir. 1984).

> To summarize on this point, § 282 creates a presumption that a
> patent is valid and imposes the burden of proving invalidity on the attacker.
> That burden is constant and never changes and is to convince the court of
> invalidity by clear evidence.  Deference is due the Patent and Trademark
> Office decision to issue the patent with respect to evidence bearing on
> validity which it considered but no such deference is due with respect to
> evidence it did not consider.  All evidence bearing on the validity issue,
> whether considered by the PTO or not, is to be taken into account by the
> tribunal in which validity is attacked.

American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360 (Fed. Cir.

1984), abrogated on other grounds, Therasense, Inc. v. Becton, Dickinson and Co., ___

F.3d ___, 2011 WL 2028255 (Fed. Cir. May 25, 2011) (inequitable conduct).  Thus the

Federal Circuit has stated that "the presumption of validity and heightened burden of proving invalidity 'are static and in reality different expressions of the same thing–a single hurdle to be cleared.'" Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1258 (Fed. Cir. 2004). Moreover, because the presumption is one of law, not of fact, it does not constitute evidence to be weighed against the challenger's evidence. Id. at 1258-59.

### F.     The Burdens of Proof

The Federal Circuit has provided a detailed analysis of the two relevant burdens of proof–the burden of persuasion and the shifting burden of production. Technology Licensing Corp. v. Videotek, Inc., 545 F.3d 1316 (Fed. Cir. 2008). The burden of persuasion "is the ultimate burden assigned to a party who must prove something to a specified degree of certainty." Id. at 1326. The patentee bears the burden of persuasion regarding infringement under a preponderance of the evidence standard. Id. at 1327. The alleged infringer bears "the burden of persuasion" to "prove invalidity by clear and convincing evidence." Id.

"A quite different burden is that of going forward with evidence–sometimes referred to as the burden of production–a shifting burden the allocation of which depends on where in the process of trial the issue arises." Id. With respect to invalidity, the alleged infringer has the initial "burden of going forward with evidence" of invalidity. Id. "At that point, [the patentee] has the burden of going forward with evidence" of validity. Id. If the patentee introduces such evidence, "the burden of going forward again shifts to the proponent of the invalidity defense" to "convince the court" that the patent is invalid.

Id. at 1328.  If "the court is not persuaded by clear and convincing evidence that [the alleged infringer] is correct, then [it] has failed to carry its ultimate burden of persuasion, and its defense of invalidity" fails.  Id.

In the summary judgment context, these rules must be applied with the understanding that the party opposing such a motion need not, in order to defeat the motion, actually carry its burden of persuasion, but rather simply identify genuine issues of material fact regarding the particular issue.  Cable Elec. Prod., Inc. v. Genmark, Inc., 770 F. 2d 1015, 1022-23 (Fed. Cir. 1985) (explaining that once alleged infringer had established "a prima facie case for overcoming the presumption of validity, it fell upon [the patentee] to submit evidence setting forth specific facts raising a genuine issue for trial."), overruled on other grounds Midwest Ind., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356 (Fed. Cir. 1999) (choice of law).  See generally supra section II.A.

## G.     The Competing Stories of Inventorship

With this understanding of the scope of the single claim of the '708 patent, the presumption of validity, and the parties' respective burdens, the Court turns to the competing stories of inventorship.  The parties present conflicting accounts of who conceived of the design reflected in Safco's 4049 pushcart as well as that which is also reflected in Welcom's allegedly-infringing pushcart.

Safco essentially claims that its distributor, Thaler, acquires its patented pushcart from a Taiwanese manufacturer, the Chengde company, and that none of Safco's pushcarts are manufactured in China by Jian's company.  Safco argues that Chang and

Thaler used Jian only to implement Chang's already-conceived design and to produce a prototype.  Welcom, however, claims that Jian at least contributed to the claimed invention if not having conceived of the entire design himself and thus not only validly manufactures Welcom's pushcart in China but also manufactures the pushcarts that Safco claims are made in Taiwan by Chengde.  Thus, Welcom has asserted a counterclaim under the Lanham Act alleging that Safco's model 4049 pushcarts bear a false designation of origin.

### 1.    Chang's Story

Chang testified that he got involved in the handcart business when he and his father established Thaler, a trade company that did not manufacture pushcarts, but rather only imported and exported, at first, the wheels for the carts and later, the carts themselves.  (Doc. No. 183 (Declaration of Willmore F. Holbrow), Ex. 301, at 18-20.) Chang stated that sometimes his father would design a pushcart, such as the model 4062, but Chang does not remember how his father designed that cart.  (Id. at 25.)  Nor does he recall whether the U.S. patent his father obtained "was for the appearance or for the utility," although he recalls that he discussed with his father "how to make it more appealing," but again cannot "remember the details" of that discussion.  (Id. at 28.) Chang also testified that he does not know whether Jian had any involvement with the design of the model 4062 pushcart, but that once it was developed, Chang had Jian's company manufacture that cart.  (Id. at 29.)  Chang further states that he does not know who "came up with the gear design . . . that connects the toe plate with the wheels," and

that he is not sure what features his father designed with respect to the model 4062 cart. (Id. at 31.)

With respect to Safco's model 4049 pushcart, which Shunhe refers to as the 90S model, Chang claims that it was "his idea." (Id. at 36.) He explained that he provided Shunhe with the sample Safco had sent him and "told them what kind of changes I would like to see," to make the drawings and then to provide Chang "with the sample." (Id. 37.) Chang testified that he forwarded on to Jian at Shunhe the Wesco Mini Mover to use as a reference along with the existing model 4062 pushcart so as to develop a smaller version of the model 4062. (Id. at 38.) Chang claims he wanted Jian to create the new pushcart based on the Wesco Mini Mover, but to come up with a different handle that did not use a push button to control its height, to remove the bottom part of the lower support member, and with respect to the toe plate, to retain the same appearance as used on the model 4062 but to make one of the openings smaller to prevent smaller goods from falling through that portion of the toe plate. (Id. at 39-41.) Chang also explained that in light of cost considerations, the new smaller cart should replace the middle bar with another mechanism to prevent goods from falling through the back of the cart and that the supporting crossbar could be thinner. (Id. at 45-47.) In sum, he testified that his design involved "[t]he handles, the crossbar, the shoulder, [and] the toe plate [opening]." (Id. at 49.) He also stated that he suggested removing the grooves on the bottom part of the base support. (Id. at 50.)

Chang testified that he did not make any drawings of his design, however, because

he does not know how to draw and Jian's factory was "very capable of making the drawings." (Id. at 49.)  Chang also states that he met with Jian in person at the Shunhe facility to explain the differences in Chang's design from the Wesco Mini Mover.  (Id. at 51.)

With respect to the handle, Chang testified that in lieu of the push-button mechanism for adjusting the height of the handle on the Mini Mover, the new cart should employ a different mechanism as already used on an existing pushcart Jian manufactured. (Id. at 54.)  With respect to the shoulders, Chang stated that he told Jian just to use a curved shape instead of a rectangular shape so as to save costs.  (Id. at 57.)

Accordingly, Jian created drawings of the proposed design.  (Id.)  Chang clarified that he had nothing to do with creating those drawings.  (Id. at 66.)  Chang testified that Jian's drawings were accurate in terms of what he designed.  (Id. at 57.)  Once Chang received the drawings he does not think he made any changes to the design.  (Id. at 61.)  Thus, Chang told Jian the drawings were fine and Jian should move forward with manufacturing a prototype.  (Id. at 61-62.)

Chang explained that because Thaler did not manufacture pushcarts, it obtained them from various manufacturers, including Shunhe.  Before the December 2004 anti-dumping duty was imposed, Shunhe manufactured in China several models of pushcart for Thaler, including the 4062 and 4053 models.  (Id. at 120.)  And because Shunhe did not then have an export license, the pushcarts it manufactured for Thaler were first routed through Song Feng, an import / export company.  (Id. at 66-68.)  In January 2004, Chang

asked Song Feng to obtain two samples of the new pushcart from Shunhe, what was then designated as the TP-2 by Thaler, the 4049 by Safco, and the 90S by Shunhe. (Id. at 72.-73.) Chang received a sample before January 15, 2004, and forwarded the sample to Safco. (Id. at 79-80.) Chang did not request that Jian make any changes to the sample. (Id. at 81.)

Chang testified that once the design was complete, he did not begin buying the 90S pushcart from Shunhe, as he had in the past with respect to other models. (Id. at 87.) Rather, Thaler obtained the production version of the new pushcart from Chengde. (Id. at 95.) Chang states that he never had Shunhe manufacture any model 90S pushcarts for Thaler's customers. (Id. at 98.) Chang also states that Chengde removed the Chinese patent markings from the pushcart and later added the indication of the U.S. patent. (Id. at 96.)

Chang testified that he then hired a law firm in Taiwan to file a patent application in the United States for the design, which was the first patent for which he had applied. (Id. at 81-82.) Chang provided the attorney with a sample of the 90S pushcart that he had obtained from Shunhe. Chang further states that he orally told Jian that he (Chang) had invented the design while he was applying for the U.S. Patent, and that Jian had no response. (Id. at 85-86.) Moreover, Chang testified that Jian did not claim to be the designer until the present lawsuit. (Id. at 86.) Chang states that he told Jian he would be filing the application in his own name, but did not send Jian a copy of that application. (Id. at 87.)

Chang also testified that there was a product liability lawsuit regarding the model 4062 pushcart, involving not only Thaler but also the retailer, Safco and Shunhe.  (Id. at 150-51.)  Chang recalls that the injured consumer sued the retailer, which then cross-claimed Safco, which then cross-claimed Thaler, and that Thaler then cross-claimed Shunhe because Shunhe was the manufacturer of that cart.  (Id. at 151-52.)

### 2.     Jian's Story

Jian, on the other hand, asserts that Chang approached him only with the most general idea of what Chang wanted, and that Jian conceived of the patentable subject matter–the claimed design–while working towards a final production model for Chang.  "Mr. Chang has simply hijacked Mr. Jian's invention by taking credit for Mr. Jian's work product."  (Doc. No. 181, at 4.)  Thus, while Plaintiff contends that Jian has no documentary corroboration to support his claim of inventorship, Plaintiff's argument assumes that Chang fully conceived of the design first, such that Jian's drawings are merely post-conception reflections of Chang's design.[11]

---

[11]     Jian also claims to have designed the 4062 model pushcart that Safco alleges was designed by Chang's father, who holds a U.S. design patent on the ornamental features of the 4062 pushcart.  (See Doc. No. 179, at 5 & n.9.)  Defendants note that Safco's interrogatory responses identify a products liability action regarding the 4062 pushcart in which Chang defended Thaler by asserting that *Jian* designed the 4062 pushcart.  (Id.)  Safco counters by arguing that the products liability action only reflects that Jian designed the *functional* aspects of the 4062 pushcart, as the ornamental features could not be the basis of any defective design claim.  A U.S. design patent issued in February 2002 identifying Marvin Chang's father, Chung-Hsien Chang, as the inventor of the design for the 4062 pushcart.  (Doc. No. 192, Ex. 5; Doc No. 169, Ex. 31.)  But Thaler's discovery responses, verified by Marvin Chang, repeatedly state that Shunhe designed and prepared a prototype handcart, without differentiating between the utilitarian features of that cart and whatever ornamental features it possessed.  And the

(continued...)

As discussed above, in cases of alleged non-joinder of an inventor, the purported inventor must produce corroborating evidence to support his testimony that he conceived of the invention.  Acromed Corp. v. Sofamor Danek Group, Inc., 253 F.3d 1371, 1379 (Fed. Cir. 2001).

> Corroborating evidence may take many forms.  Reliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention.  Circumstantial evidence about the inventive process may also corroborate.  Additionally, oral testimony of someone other than the alleged inventor may corroborate.

Trovan, Ltd., 299 F.3d 1302-03 (internal citations and quotations omitted).

Here, Jian's drawings and other documentary evidence plainly qualify as corroborating evidence of his claim of inventorship.  Jian testified that since he formed Shunhe in 1996, the company has developed over 50 types of pushcarts, and that Chang started to purchase several models in 1996.  (Doc. No. 183, Ex. 300 at 13.)  Jian stated that he developed the model 90B, what Safco designates as the model 4062, in about 2002.  (Id. at 14.)  He explained that he did not develop it solely for Thaler, but rather for the entire market and that he did not design it for any particular customer.  (Id. at 17-18.)

Jian also testified that while Chang asked him to design a smaller version of the model 4062, Jian already had his own concept for such a cart.  (Id. at 18.)  Jian states that the first conversation he had with Chang about a smaller cart was by telephone in September or October of 2003.  (Id. at 20.)  Jian testified that he did not have any

---

[11](...continued)
patent application filed by Marvin Chang's father is for a *utility* patent.  (Doc. No. 169, Ex. 209.)

personal meeting with Chang, but that Chang had mailed the Wesco Mini Mover to Jian as a reference to enhance Jian's research.  (Id. at 22.)  Moreover, Jian asserts that Chang did not discuss with him what Chang wanted the new cart to look like, only that it be smaller.  (Id. at 22-23.)  Chang neither requested any specific design nor told Jian how the smaller cart should look.  (Id. at 23.)  Moreover, Jian stated that Chang did not tell him how he wanted the handle to look because Chang "was not a technical person."  (Id. at 23.)  Jian also states that Chang did not specify a handle used on other Shunhe carts, the design of the toe plate or the shoulder design.  (Id. at 24-25.)  Jian testified that Chang had no input with respect to the design other than providing the Wesco cart as a reference.  (Id. at 25.)  Furthermore, Jian stated he already had been thinking about a smaller cart in 2002.  (Id.)  Jian asserts that he did not use the features of the Wesco cart because his product was to be different from Wesco's and further, that he does not copy the designs of others.

Jian explained that Shunhe was already selling a smaller cart in 2002 or early 2003–the model 35C.  (Id. at 30-31.)  In addition, he was already in the process of designing the model 90S.  (Id. at 31.)  Jian testified that he had produced sketches and drawings before September 2003 reflecting his ideas for a smaller cart.  (Id. at 32.)  Jian explained that his customers had a need for a smaller cart and that his specific idea was for a foldable, light, and small cart convenient for the user, and that the look would be based on his 90B model, the retractable wheels would be based on the 35C model and the telescoping handles would be based on his model FW38.  (Id. at 33.)

Jian identified the model 4049 cart that was marked with his Chinese patent number (as well as an indication that applications were pending in the U.S., Japan and Germany) as his model 90S, labeled as a model 4049 for Safco.  (Id. at 35.)  He also noted that the folding wheels on the cart were used on his FW 35C cart.  He further stated that he designed the toe plate in 2003 based on similar larger ones they already had.  (Id. at 36.)  He explained that Shunhe had a lot of toe plates, the largest of which was that used on the model 90L.  (Id. at 37.)  Moreover, he used all of the three or four general types of toe plates as references for his design of the 90S.  (Id.)  He came up with that design in late 2003, working with engineers.  (Id. at 37-38.)  Specifically, he based the design on the weight that the cart could bear, the unit price that would be viable in the market, and the thickness of the plate.  (Id. at 39.)  Jian testified that he had no discussions with Chang regarding maintaining the five openings in the toe plate, and that he (Jian) decided to retain the five-opening design.  (Id.)  Furthermore, Jian and his technicians together drew the technical production drawings for the particular shape of the toe plate openings.  (Id. at 39-40.)  He explained that designing the cart was not just about the shape, but rather also about its function and certain mechanical principles.  (Id. at 40.)  He also stated that he created the design keeping in mind the need to save materials and to reduce the cost.  (Id. at 41.)

Jian further testified that the shoulder design and retaining the brace in the middle were his ideas.  (Id.)  He expressly stated that Chang contributed nothing to the design of the 90S and that Chang never told him he wanted a toe plate with five openings including

a small triangle.  (Id.)  Jian asserted that Chang had no technical knowledge at all and

was only a distributor.  (Id. at 42.)

Jian clarified that he based the design of the 90S on the 90D, the FW92, the 90B,

and the 95.  (Id. at 44.)  He explained that he created the handle portion at the same time

he created the toe plate and the rest of the cart, in approximately September of 2003.  (Id.

at 45.)  He also explained that while many of the pushcarts on the market had a particular

height, Jian's technology allowed one to control and adjust the height.  (Id.)  Jian also

testified that he designed the appearance of a particular portion of the handle at the same

time he designed the rest of the cart.  (Id. at 46.)  He explained that his design was based

on convenience for the users, the aesthetics of the cart, and to avoid the operator's hand

from interfering with the goods on the cart when the handle was fully retracted.  (Id.)

Jian stated that his designs were not copies of any other products, but based on his own

research and thoughts as to how to improve the product.  (Id. at 47.)  He further

elaborated that it took him and his team a whole year to come up with the exclusive

design for the retractable wheels.  (Id.)

With respect to the telescoping action, Jian testified that he based the design of the

90S on that of the FW38 but made it more convenient to adjust the height, as it could be

done with one hand.  (Id. at 49.)  Moreover, he wrapped the metal portion in plastic and

used a shape other than square in order to "make it pretty."  (Id. at 50-51.)  Finally, he

explained that he did not base that feature on the Wesco cart because Wesco had already

applied for a patent on their design and Jian could not copy them.  (Id. at 52.)  Jian

testified that the plastic wrap was added as the final drawing was completed.  (Id. at 53.)

He added that it took him over three months to come up with the overall appearance of

the 90S, but that, because many customers wanted a smaller cart, he had been thinking

about the overall design of the cart for about a year.  (Id. at 53-54.)  Ever since he

developed the model 35C, he was already considering using aluminum and making a

more sturdy and more aesthetically pleasing cart.  (Id. at 54.)  At the beginning of the

design process, he did not write his ideas down as he was thinking about them and

accumulating information every day.  (Id. at 55.)  Jian shared his desire to develop a

smaller hand truck with Chang, who said his customers were looking for a quality smaller

cart.  (Id.)

Once the 90S model was developed, Jian filed an application for a Chinese patent

on April 14, 2004.  (Id. at 60-61.)  Jian noted many of the various Chinese patents he

obtained for various pushcarts, including two for the model 90B, one for the functionality

and one for the outward design.  (Id. at 73.)

Jian testified that the computer-aided drawings of the design that became the 90S

were done at Shunhe and under his direction.  (Id. at 79-80.)  Moreover, Jian emphasized

that Chang did not tell him to make any of the features shown in the drawings.  On

September 23, 2003, Jian sent Chang the drawings, as he does with all of his customers,

to solicit his opinions.  (Id. at 80-82.)  But Chang never responded to the e-mail with the

drawings attached.  (Id. at 81.)  In a telephone call, Chang only mentioned that he had

received the e-mail and was very happy to see Jian's product.  (Id. at 83-84.)  On

September 23, 2003, Jian sent Chang another e-mail with attached photos showing the height and adjustment of the handles in order to explain how to use them.  (Id. at 82-83.) Jian further explained that the oval shaped handles he designed for the 90S were different from those on the Wesco cart, which used a square shape.

Jian testified that once his engineers, under Jian's direction, prepared the final drawings of the entire cart, on or about October 18, 2003, they started to make a prototype.  (Id. at 84.)  Jian explained that the October drawings were different from the September drawings because, in the interim, they realized that when the handle was retracted, the operator's hand would touch the lower portion of the support and thus bump the cargo.  (Id. at 85.)  Accordingly, Jian changed the shape to oval to avoid the operator's fingers getting smashed.  (Id. at 86.)   In addition, Jian changed the crossbar at the bottom from rectangular to cylindrical and then wrapped it in plastic so that any rust on the metal portion would not be visible.  (Id. at 86.-87.)  Jian stated that it took about fifty days to make the final drawings.  (Id. at 87.)  Once the design was complete, Shunhe started to create a prototype.  (Id.)

Jian then sent some samples to Chang sometime before January 15, 2004.  Jian testified that Chang's only suggestions were related to the locking mechanism and to change the color of the upper cross brace from black to yellow.  (Id. at 97.)  Jian then began selling the 90S cart to Chang labeled as a "Safco" cart on the crossbar.  (Id. at 100.) Jian identified a model 4049 "Safco" cart that was marked with his Chinese patents as a cart manufactured by his company.  He stated that his company manufactured the model

4049 (a/k/a 90S) carts, as well as the model 90B cart, for Safco until 2008.  (Id. at 101.)

Jian clarified that all of the carts he manufactured were sold fully assembled.  (Id. at 102-

03.)

Jian further testified that he marked both the model 4049 carts he made for Safco

and the carts he made for Welcom with his Chinese patent numbers, as the same mold

was used for both carts.  (Id. at 104-05.)  He clarified that when the carts left his factory

they did not have a "Made in Taiwan" sticker on them.  (Id. at 121.)  He stated that those

carts also bore the indication that patents were pending in the United States (as well as in

Germany and in Japan).  (Id. at 105.)  Jian explained that he had his customers in those

countries apply for the respective patents and that Chang agreed to file the application for

him in the United States.  (Id.)  Jian stated that he did not vigorously follow up on

Chang's progress with the application process as Chang was his customer.  (Id. at 106.)

Jian testified that he stopped manufacturing carts for Chang and Safco when they

asked him to stop selling carts to Welcom.  (Id. at 107.)  Jian also stated that Chang asked

him to not testify in the present action.  (Id. at 113-14.)  Jian testified that Chang never

told him that Chang believed that he was the inventor of the model 90S cart and never

indicated that he would take legal action to invalidate Jian's Chinese patents.  (Id. at 118.)

Jian testified that he obtained two Chinese patents, one utility patent and one

design patent, for the model 90B (a/k/a model 4062) cart, further clarifying that he came

up with all of the design features of that cart.  (Id. at 122-23.)  Jian stated that he asked

Chang to file an application for a U.S. design patent regarding the 4062 cart identifying

Jian as the inventor, but later learned that Chang identified himself as the inventor.  (Id. at

123-24.)  When Jian received from Welcom a copy of the Complaint in late 2008 or 2009,

and thus discovered that Chang had not identified Jian as the inventor of the design used

in the 90S / 4049 model, Jian stopped marking the pushcarts as indicating a patent

application was pending in the United States.  (Id. 153-54.)

Finally, Jian testified that someone from Safco sent an e-mail to him indicating

that they wanted to come to China to visit Jian's factory, but that, in the end, no one came

despite Jian having told them that they could visit at any time.  (Id. at 137-38.)

### H.    Inventorship Cannot Be Resolved on Summary Judgment

In short, Jian and Chang's testimony paints two vastly different–and quite likely

irreconcilable–factual pictures of inventorship.  To bolster its position, Safco relies

substantially on the Federal Circuit's decision in Hoop v. Hoop, 279 F.3d 1004 (Fed. Cir.

2002).  In Hoop, the majority affirmed the district court's issuance of a preliminary

injunction in favor of the Hoop brothers, ruling that they were likely to prevail on the

merits of their claim that their patent was valid in an action brought by their cousin and

his ex-wife, after their patent, which had issued shortly after the brothers' patent, was

rejected in a reexamination proceeding as anticipated by the brothers' patent.  Each patent

application was based on the same drawings, which had been prepared by the brothers'

cousin's ex-wife.  The plaintiffs then filed a Section 291 priority action in district court

seeking to invalidate the brothers' patent and the brothers counterclaimed.  The district

court found that the plaintiffs had "merely refined and perfected the Hoop brothers'

concept," such that "the two designs were not separate inventions."  Id. 1008.  On appeal,

the majority agreed that the district court "could permissibly conclude at the preliminary

injunction stage that the second design was likely to be found to be merely a more refined

version of the first."  Id.  The majority expressly clarified, however, that "final resolution

of this factual question must await a trial on the merits."  Id.

Thus, Hoop reinforces the principle that, in an inventorship dispute regarding a

design patent, the question of who contributed what to a design often involves fact issues.

In addition, simply because the majority found that the earlier drawings of the Hoop

brothers likely constituted the claimed subject matter of the design and that the later

drawings were merely refinements of the already-conceived invention, does not mean that

inventorship disputes are always resolved in favor of the first party in the chronological

timeline of the design's development.[12]

Here, in contrast, Chang had no drawings or other pictorial representation of his

purported design.  Rather, he only forwarded to Jian the Wesco Mini Mover as an

example of the size of a new cart that could be based on the existing 4062 cart.  Neither

cart, of course, could serve as the basis for the design claimed in the '708 patent.  Thus,

---

[12]     Moreover, as the dissenting judge in Hoop observed, in situations where
one purported inventor submits a design to another purported inventor who then makes
changes to the original design, several possibilities exist:  (1) the first party conceives of
the invention and the second party merely reduces it to practice without making
"significant changes in the original proposal necessary to carry out the conception"; (2)
"[t]he second party's work may constitute a separate invention if it is different in respects
that render it nonobvious and the first party did not conceive of those aspects"; (3) "[i]f
the parties worked together, they may be co-inventors"; and (4) the first party's idea is
neither sufficiently novel nor fully developed to be patentable until the second party
refines it.

the inventorship question here is more problematic than that faced in <u>Hoop</u> because this

Court must decide whether (1) Chang's oral instructions to Jian were both final enough to

constitute the conception claimed in the '708 patent, and novel enough to render that

conception patentable over the existing prior art, such that Jian's contribution was only a

reduction to practice or other non-inventive contribution, or (2) Chang's description of

what he wanted from Jian was simply a non-patentable request for a smaller cart, such

that Jian's contribution to the design is at least sufficient to render him a co-inventor, if

not the sole and exclusive inventor.[13]

Resolution of this question, however, will depend in large part on the fact-finder's

assessment of the credibility of the two purported inventors.  The fact that a patent is

presumed valid does not mean that the credibility of the named inventor is beyond

dispute.  <u>See</u> <u>New England Braiding Co. v. A.W. Chesterton Co.</u>, 970 F.2d 878, 884 (Fed.

Cir. 1992) (explaining that plaintiff was not likely to succeed on the merits where

---

[13]     Safco also relies on <u>Sunbeam Products, Inc. v. Wing Shing Products (BVI)</u>
<u>Ltd.</u>, 153 Fed. Appx. 703 (Fed. Cir. 2005), but insofar as <u>Sunbeam</u> relies on <u>Hoop</u>,
<u>Sunbeam</u> is likewise distinguishable.  <u>Superior Merchandise Co. v. M.G.I. Wholesale</u>
<u>Inc.</u>, 52 U.S.P.Q.2d 1935 (E.D. La. 1999), is likewise distinguishable because the named
inventor had drawn sketches of the patented design that he then communicated to the
manufacturer of the design mold, his conception was corroborated by the testimony of a
vendor, and the manufacturer, which was not the allegedly-infringing defendant, made no
claim of inventorship.  Safco attempts to rely on <u>Superior Merchandise</u> to support its
argument that "there is no rule that conception is evidenced only by a sketch."  (Doc. No.
191, at 7 & n.9 (noting that in <u>Superior Merchandise</u> the "design conception [was] relayed
by telephone").)  But in <u>Superior Merchandise</u>, although the patentee "orally requested"
the Chinese manufacturer to produce the design, the patentee had first drawn sketches.
Such inventor drawings clearly provide better evidence of precisely what the patentee had
designed compared to a patentee's recollection of what he, without any drawings, orally
told the manufacturer to produce.

credibility of named inventor was undermined).[14]

With respect to the named inventor's credibility, the parties vigorously dispute whether, once inventorship is challenged (at least by someone claiming to be an omitted inventor or co-inventor), the named inventor is also subject to the clear and convincing standard and the corroboration requirement. This dispute turns, in part, on whether the law applicable in priority and interference proceedings before the PTO, on which Welcom relies, also applies in federal court in infringement actions premised on an issued patent.

Welcom contends that Chang, as the named inventor, is also subject to the corroboration requirement once they, as the parties challenging validity, have established a prima facie case of Jian's co-inventorship or sole inventorship. (Doc. No. 188, at 13-17.) Welcom further claims that the burden of clear and convincing "proof is, then, identical in both" infringement actions as well as interference proceedings. (Doc. No. 188, at 14.)[15] Safco claims that it need not corroborate Chang's testimony of conception,

---

[14]    The fact that New England Braiding concerned the propriety of a preliminary injunction does not undermine the relevance of the inventor's credibility. But while the court may properly assess an inventor's credibility on a motion for a preliminary injunction, credibility is an issue for the jury here.

[15]    Welcom argues that "Federal Circuit decisions in patent infringement lawsuits involving claims under § 102(f) frequently rely on Federal Circuit decisions arising from appeals of proceedings from the Board of Patent Appeals and Interferences." (Doc. No. 188, at 13-14 (noting that Trovan, "an infringement case[,] cites to Price v. Symsek" and "also relies on Coleman v. Dines," "another interference case").) Trovan does cite Price and Coleman with respect to the principle that alleged co-inventors must meet their burden under the clear and convincing standard by providing corroborating evidence of their claim of inventorship. 299 F.3d at 1302-03. But this is not to say that in

(continued...)

and that interference or priority decisions imposing any such requirement are inapposite

in the present infringement action.  (Doc. No. 179, at 14-17.)[16]

The Court does not agree that, as a matter of law, inventorship, once challenged,

must always be corroborated by a named inventor on an issued patent.[17]  The

---

[15](...continued)
an infringement action where the alleged infringer challenges inventorship regarding an
issued patent, the named inventor is always required to corroborate his claim of
conception.

[16]    Safco argues that the presumption does not apply in PTO proceedings
because they involve only patent applications.  (Doc. No. 179, at 15.)  Generally, the
distinction between an infringement action and a priority or interference action is one
"with a difference.  Patents in infringement suits are presumed valid by statute.  No such
presumption attaches before the PTO."  In re Morris, 127 F.3d 1048, 1054 (Fed. Cir.
1997).  "The presumption does not attach until a patent has issued."  Id. at 1054 n.3.
Accord In re Caveney, 761 F.2 671, 674 (Fed. Cir. 1985) ("[P]atent applications are not
entitled to the procedural advantages of 35 U.S.C. § 282.").  In Morris, however, the
Federal Circuit reviewed a decision of the PTO denying a patent application.  And not
even all PTO proceedings involving opposing parties are confined to patent applications.
Some involve interferences between an issued patent and a patent application.  For
example, a derivation proceeding often involves an issued patent, as the issue is whether
"the patentee derived the invention from another."  Price, 988 F.2d at 1190 (addressing
interference proceeding between an issued patent and a patent application).  Moreover,
and even though the presumption and the clear and convincing standard are two sides of
the same coin, Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1258 (Fed. Cir. 2004)
(stating that they are "in reality different expressions of the same thing–a single hurdle to
be cleared'"), the clear and convincing standard does apply in PTO proceedings regarding
derivation or priority, both of which "focus on inventorship."  Price v. Symsek, 988 F.2d
1187, 1191-94 (Fed. Cir. 1993).

[17]    In support of their corroboration argument, Defendants rely on Singh v.
Brake, 222 F.3d 1362 (Fed. Cir. 2000).  But Singh was an appeal from a PTO interference
proceeding that awarded priority to the patentee.  Id. at 1363.  The Federal Circuit's
discussion of corroboration was directed at the patent applicant, who, of course, was
entitled to no presumption of validity.  Id. at 1367-68.  Defendants also rely on Coleman
v. Dines, 754 F.2d 353 (Fed. Cir. 1985), in support of their argument that a "patent owner
lost rights . . . when he was unable to provide sufficient corroborating evidence."  (Doc.

(continued...)

corroboration requirement is imposed to prevent fraud by alleged inventors who would otherwise premise their claim of inventorship solely on their own testimony.  A named inventor, however, has obtained a patent by persuading the PTO that, among other things, he is the true inventor based on documentation including an inventor's affidavit.

Nevertheless, here, Welcom has established a prima facie case of inventorship (or co-inventorship), thereby shifting the burden of production (although not the burden of persuasion) to Safco to produce sufficient evidence of Chang's inventorship to rebut Welcom's showing.[18]  Although Safco cannot now simply rely on the presumption of inventorship to rebut Defendants' showing, as that presumption does not constitute substantive evidence, the presumption remains intact such that Welcom remains subject

_____

[17](...continued)
No. 167, at 4.)  But in Coleman, the interference was between two patent *applicants*.  754 F.2d at 354.  Similarly, in Burroughs Wellcome Co. v. Barr Labs. Inc., the Federal Circuit's discussion of corroboration appears to have concerned only the defendants' claims of co-inventorship, as they conceded that the five inventors listed on the patents were all properly named as inventors.  40 F.3d 1223, 1225 (Fed. Cir. 1994).  But see University of Pittsburgh v. Hedrick, 573 F.3d 1290, 1293, 1298 (Fed. Cir. 2009) (apparently applying the corroboration requirement to some of the seven named inventors in a case of alleged mis-joinder–that is, where the patent as issued named certain inventors who were later alleged to have not contributed to the conception of the claimed subject matter–to conclude that only two of the inventors, Katz and Llull, were properly named on the patent, and affirming the district court's "finding [of] clear and convincing evidence that Katz and Llull conceived of each claim of the invention through contemporaneous corroboration before the arrival of" the others).

[18]      Safco argues that because of the presumption of validity, "[t]he burden is not on Chang or Safco to come forward with any evidence substantiating Chang's conception of the patented design." (Doc. No. 179, at 2.)  Although Safco may initially rely on the presumption–Safco bears no original burden to prove validity–once Welcom identifies evidence constituting a prima facie showing of invalidity, the burden of production shifts to Safco to introduce countervailing evidence.

to the clear and convincing standard of proof in carrying their ultimate burden of persuasion.  But insofar as Safco's evidence of Chang's inventorship is confined to his testimony, which is subject to a credibility evaluation by the fact-finder, Safco would be well-advised, at trial, to support Chang's story with corroborative evidence in order to rebut Jian's testimony and documentary evidence.  Thus, even assuming that a named inventor, rather than an alleged inventor, need not produce corroborating evidence of his conception of the claimed subject matter, the fact that a named inventor lacks any contemporaneous drawings of the design nevertheless means that if the alleged inventor produces prima facie evidence of inventorship or co-inventorship, the credibility of the named inventor becomes all that more crucial in upholding the validity of the patent.

Safco also suggests that Welcom's burden consists of two separate components–that is, that "Welcom must adduce not only clear and convincing testimony about the conception of the entire patented design, but must also produce corroborating evidence of a disclosure contemporaneous with an alleged conception."  (Doc. No. 179, at 2.)  But the Federal Circuit has framed the issue in terms of an integrated standard, explaining that "[t]o meet the clear and convincing burden of proof, alleged co-inventors must prove their contribution with more than their own testimony respecting the facts surrounding a claim of derivation or priority."  Trovan, 299 F.3d at 1302.  Thus corroboration is a necessary component of the clear and convincing evidentiary standard.  Nevertheless, the "clear and convincing" standard concerns the *weight* or *amount* of the evidence, whereas corroboration concerns the *type* of evidence, that is, evidence other

than the putative inventor's own testimony.  Thus, although the two evidentiary standards

concern different issues, it appears that there is only a single integrated evidentiary

burden imposed on an alleged inventor.

Safco further contends that Welcom must also show that Jian communicated his

prior conception of the design to Chang.  (Doc. No. 179, at 15 (quoting Gambro Lundia

AB v. Baxter Healthcare Corp., 110 F.3d 1573 (Fed. Cir. 1997)).)   That requirement

applies to derivation claims, an invalidity defense that requires proof of "both prior

conception of the invention by another and communication of that conception to the

patentee."  Gambro Lundia, 110 F.3d at 1576.  Although Safco now contends that

Welcom has dropped its derivation defense in favor of a co-inventorship defense, it does

not appear that Welcom has elected only one form of inventorship challenge.  Insofar as

Welcom maintains that Jian is the sole inventor, such that their inventorship claim is one

of derivation, it is clear that Jian communicated his design to Chang in September 2003

by sending Chang his drawings and later a sample of the cart incorporating the final

design.  Whether those drawings reflected Jian's exclusive conception of the design is, of

course, the ultimate dispute here, the resolution of which, however, must await trial.  But

if Welcom thus establishes that Chang derived the design from Jian, the communication

element would appear to be met.

### I.    Disposition of Motions Regarding Inventorship

Here, the relevant deposition testimony, the existing documentation of product

development, and other evidence raises serious questions about whether Chang is the sole

inventor of the subject matter claimed in the '708 patent. And all of the product design documents, as well as a prototype of the product, appear to emanate from Jian. While this alone does not necessarily establish Jian's conception to the exclusion of Chang's conception, it is at least substantial evidence from which a jury could conclude that Jian conceived (either alone or in conjunction with Chang) of the claimed subject matter and that Chang only initiated the request for a prototype of a push-cart by providing Jian with the broadest of parameters that could not be claimed as patentable subject matter, such that Jian would be entitled to sole inventorship. This is particularly true insofar as Jian added various ornamental features after Chang approved the intermediate design sent by Jian in late September, such that only Jian could claim conception of such features.

As discussed above, where a clear and convincing evidence standard would apply, the alleged infringer need not actually prove, to defeat a patentee's motion for summary judgment of infringement, that clear and convincing evidence rebuts the presumption of validity (here, in particular, inventorship), but must only identify factual questions that, if resolved in the defendant's favor at trial, could demonstrate non-joinder of an inventor by clear and convincing evidence. But where the alleged infringer moves for summary judgment of invalidity for non-joinder, it must conclusively prove that the named patentee is not the sole or true inventor, and that there are no genuine issues of material fact as to who invented the claimed subject matter.

Here, Welcom has produced sufficient evidence to raise genuine issues of material fact as to who invented the claimed design. Accordingly, Safco's motion for summary

judgment of infringement (and "validity")–evaluated under the applicable standard that

Welcom is entitled to having all doubts construed, and all inferences drawn, in its

favor–must be denied.  If the fact-finder were to find Jian's testimony credible, it could,

as supported by the corroborating evidence, constitute clear and convincing evidence of

Jian's inventorship.

But because that evidence does not, at this juncture, constitute clear and

convincing evidence such that a jury could only conclude that Jian conceived of the

design (or part of it), Welcom's motion for summary judgment must also be denied.  The

requirement of clear and convincing evidence–including the corroboration component–"is

not to be taken lightly."  Ethicon, Inc. v. U.S. Surgical, 135 F.3d 1456, 1464 (Fed. Cir.

1998).  The Court emphasizes that much of the evidence in favor of both Jian's and

Chang's claims of inventorship is testimonial, requiring credibility determinations by the

trier of fact.

## J.    Inequitable Conduct

Safco also seeks summary judgment on Welcom's inequitable conduct

counterclaim.  Safco first contends that Welcom has failed to meet the applicable

pleading standard under Rule 9(b).  (Doc. No. 163, at 33.)  Granted, the Federal Circuit

"has issued significant opinions requiring specific and demanding showing of evidence

before a party may assert the defense of inequitable conduct."  Pressure Products Medical

Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1320 (Fed. Cir. 2010).  And Welcom's

pleading regarding inequitable conduct is admittedly cursory.  (Doc. No. 44.)  But it

appears that the time to have raised this argument would have been much earlier on a

Rule 12 motion to dismiss.  Now that discovery is done, and the parties have filed

motions for summary judgment, the factual record fleshes out Welcom's allegation of

inequitable conduct.

Safco also contends that Welcom has identified no evidence of any intent to

deceive the PTO.  (Doc. No. 163, at 34.)  Welcom counters by arguing that Jian's

testimony, taken as true, would provide sufficient evidence, under the applicable clear

and convincing standard, that Chang knowingly submitted false inventor affidavits to the

PTO.  (Doc. No. at 27.)

On the present record, this Court cannot conclude that no inequitable conduct

occurred.  As discussed above, there are serious factual questions regarding who invented

the claimed design.  If the jury were to find that Jian, not Chang, is the sole inventor, the

issue would become whether Chang's omission of Jian was an innocent mistake or

whether Chang knowingly submitted a false inventor affidavit.  Even if Jian contributed

to the conception of the claimed subject matter, such a conclusion would not necessitate

invalidation of the '708 patent.  Rather, if a co-inventor is omitted in error but "without

deceptive intent," the Court may direct the Commissioner of the PTO to add the omitted

co-inventor without invalidating the patent.  Pannu v. Iolab Corp., 155 F.3d 1344, 1350

(Fed. Cir. 1998) (discussing 35 U.S.C. § 256).  Accord Swede Industries, Inc. v. Zebco

Corp., 95 F.3d 1169 (table), 40 U.S.P.Q.2d 1860 (Fed. Cir. 1996).

The Court further notes that even if Jian contributed to the conception of the

design and his omission as an inventor was not without deceptive intent, the '708 patent

would be rendered invalid, but not necessarily unenforceable for inequitable conduct.  To

establish inequitable conduct,

> the party challenging the patent is required to establish by clear and
> convincing evidence that the patent applicant "(1) either made an
> affirmative misrepresentation of material facts, failed to disclose material
> information or submitted false material information, and (2) intended to
> deceive the U.S. Patent and Trademark Office."

Symantec Corp. v. Computer Associates Int'l, Inc., 522 F.3d 1279, 1296 (Fed. Cir. 2008)

(internal quotation omitted).  And even if the threshold findings of materiality and intent

are established, the court must then weigh those findings "'to determine whether the

equities warrant a conclusion that inequitable conduct occurred.'"  Id. (internal quotation

omitted).  In short, an assertion of inequitable conduct should not be made lightly as it

requires "specific and demanding showings of evidence."  Pressure Products Medical

Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1320 (Fed. Cir. 2010).

### K.    Welcom's Lanham Act Counterclaim

As noted above, Welcom's counterclaims include an allegation that Safco's model

4049 pushcart, although purportedly manufactured in Taiwan, was in fact manufactured

by Jian's company in China.  (Doc. No. 44, at 6-7.)  Welcom contends that Safco, by

mislabeling the carts with a false designation of origin, thereby attempted to avoid the

substantial tariff that had been placed on the majority of Chinese pushcarts.  (Id. at 6.)

Welcom seeks injunctive relief, damages for its losses, and recovery of Safco's profits

obtained as a result of the false designation of origin.  (Id. at 7.)

Safco now moves for summary judgment on that counterclaim on the grounds that "[n]ot a scintilla of evidence supports" Welcom's claim "that the 4049 pushcarts are made in China" and that, even assuming that the model 4049 pushcart was in fact manufactured in China, Welcom has incurred no actual loss. (Doc. No. 163, at 3, 35-41.)

### 1.      False Designation of Origin

The Lanham Act imposes liability on one who falsely designates the origin of his goods. 15 U.S.C. § 1125(a)(1). Regarding Welcom's claim that Safco falsely marks its model 4049 pushcart as having been made in Taiwan, Safco argues that Welcom has not "produced any evidence to support this allegation." (Doc. No. 163, at 37 (emphasis in original).) Safco notes that Jian testified that his company did not manufacture one particular iteration of the model 4049 "Safco" pushcart, an example that lacked the notice of Jian's Chinese patents.

Jian, however, explained that from 2005 through 2008 his company routinely manufactured model 4049 carts (as well as model 4062 carts) for Thaler, labeled as Safco pushcarts. (Doc. No. 182.) The sales to Thaler were conducted by using an export intermediary named Song Feng (also known as Gao Feng and Hicrest International Co., Ltd.). (Id.) Morever, Jian supplied photographs he took in the Shunhe factory between 2006 and 2010 of different versions of his 90S pushcart: (1) the model 4049 version labeled for Safco, (2) the same pushcart labeled for Staples, and (3) the allegedly-infringing Magna Cart sold by Welcom. (Id., Exs. E-G.) Jian explained that the particular cart upon which Safco relies–the one that lacks notice of his patents and patent

applications–is a counterfeit copy produced by someone other than Shunhe.

On September 4, 2008, shortly after this action was filed in August 2008, Welcom's President, Kerry Welsh, sent an e-mail to Safco attaching pictures of "Safco-labeled carts . . . at Shunhe's factory, awaiting shipment to Thaler," along with the related shipping documents.  (Doc. No. 181, at 33.)  In fact, Welcom produced a Safco model 4049 cart that it bought through the internet in August 2008 that bears Shunhe's patent notice–molded into the frame of the cart–indicating Jian's Chinese patents and various foreign pending patent applications, but also includes a sticker stating "Made in Taiwan." (Doc. No. 181, at 4-5; Doc. No. 168.)

Safco, in turn, contacted Chang at Thaler inquiring about the geographic origin of its model 4049 carts.  Welcom further notes that a September 13, 2008 e-mail to Jian from Thaler's Chinese shipping intermediary, apparently sent in response to Thaler having forwarded on to the intermediary a copy of Welsh's September 4 e-mail, establishes that Thaler in fact obtained its model 4049 carts from Shunhe.  The September 13 e-mail informs Jian that after his company provided purchase order information to Welcom, "[i]t is now impossible for Safco to buy your products through [the Chinese shipping intermediary]."  (Id. at 6.)  Accordingly, the shipping intermediary returned to Shunhe the products it was going to ship to Taiwan.  (Id.)

Safco argues that after it received Welsh's e-mail it conducted an independent investigation into where the model 4049 pushcarts were manufactured.  (Doc. No. 163, at 43.)  Welcom notes, however, that the resulting report–purportedly confirming Safco's

claim that the carts were made in Taiwan–has been withheld as privileged.  (Doc. No.

181, at 32.)  Safco contends that the sample upon which Welcom relies either is a

counterfeit or reflects some confusion at Thaler's Taiwanese plastic parts molder in

placing Jian's Chinese patent markings on the cart.  (Doc. No. 163, at 39.)  But the fact

that counterfeiting may be common in China does not establish that this particular cart is

in fact a counterfeit.

Resolution of these factual disputes must await trial.  The Court notes that

Welcom's evidence, in conjunction with the evidence offered with respect to the

summary judgment motions, creates a genuine question of material fact as to the

geographic origin of Thaler's model 4049 carts sold by Safco.

### 2. Remedies

Safco also argues that regardless of whatever showing of false designation of

origin Welcom might make, it nevertheless lacks standing to pursue a claim under the

Lanham Act.  In particular, Safco contends that Welcom has failed (1) to produce any

evidence of actual deception or a tendency to deceive, (2) to show the allegedly-false

designation of origin influenced consumer buying decisions, and (3) to prove actual

damages or injury resulting from the designation of origin.  (Doc. No. 163, at 35-41.)

To recover damages under the Lanham Act, an injured party must prove actual

damages and a causal link between the violation and those damages.  United Industries

Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998) (quoting Rhone-Poulenc, 93

F.3d at 515).  Here, however, Welcom does not attempt to rebut Safco's claim that

Welcom has failed to produce any evidence of sales lost to Safco.  Moreover, Welcom readily concedes that its pushcart business is booming.  In fact, Welcom's sales of the MagnaCart are not only booming, but apparently much greater than Safco's sales of the model 4049 pushcart.

The Lanham Act, however, establishes its own flexible statutory remedial scheme.  Upon establishing "a violation under section 1125(a)," the party "shall be entitled . . . *subject to the principles of equity*, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Id. § 1117(a) (2006).  Welcom's Lanham Act counterclaim tracks the various remedial options as it seeks not only monetary recovery, but also an injunction.  The Lanham Act specifically provides for injunctive relief.  15 U.S.C. § 1116(a) (providing that courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation under subsection (a), (c), or (d) of section 1125").  Thus, it would appear that Safco could not obtain summary judgment on that counterclaim simply because Welcom could not substantiate its claim of damages for lost sales.

Moreover, Welcom now appears to confine its request for a monetary remedy to disgorgement of Safco's profits rather than a recovery of Welcom's damages for its own lost sales.  (Doc. No. 181, at 35.)   In fact, "[f]or violations of the Lanham Act based on false advertising, a plaintiff's recovery may include both actual damages and the defendant's profits." Wildlife Research Center v. Robinson Outdoors, Inc., 409 F. Supp.

2d 1131, 1135 (D. Minn. 2005) (noting, however, that "the plaintiff's total recovery is subject to principles of equity").  But a party "is not entitled to recover [the wrongdoer's] profits to the extent that they duplicate [the injured party's] actual damages."  Id. at 1136.  Accordingly, the fact that Welcom has not–and apparently cannot–support a claim of any actual damages would not necessarily warrant summary judgment for Safco on Welcom's Lanham Act counterclaim.

Safco also contends that Welcom must show that the false statement caused actual deception or a tendency to deceive.  Safco argues that Welcom has not produced "any customer testimony or survey evidence" regarding deception.  (Doc. No. 163, at 39.)  But here, if the pushcarts at issue were manufactured in China, the "Made in Taiwan" designation would be literally false.[19]  "If a plaintiff proves that a challenged claim is literally false, a court may grant relief without considering whether the buying public was actually misled; actual consumer confusion need not be proved."  United Industries Corp. v. The Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998).  Thus consumer survey evidence is unnecessary.  Id. at 1182-83 ("[U]nless a commercial claim is literally false, or a trier of fact has determined that a competitor acted willfully with intent to deceive or in bad faith, a party seeking relief under [section 1125(a)] of the Lanham Act bears the ultimate burden of proving actual deception by using reliable consumer or market research").

Moreover, the Eighth Circuit recently has clarified that "[n]either the relevant

---

[19]     And it seems beyond dispute that a statement that the product was "Made in Taiwan," if false, is at least *likely* to deceive consumers into believing that the product was, in fact, made in Taiwan.

statutes nor our previous case law dictates that we require actual confusion to support" a

jury's award of disgorged profits.  Masters v. UHS of Delaware, Inc., 631 F.3d 464, 472

(8th Cir. 2011).[20]  The court further explained that "requiring actual confusion would

undermine the equitable nature of the Lanham Act's remedial scheme."  Id. at 473.

"Section 1117 makes an award of the infringing party's profits subject only to the

principles of equity.  Disgorgement exists to deter would-be infringers and to safeguard

against unjust enrichment."  Id.  Moreover, while "[a]n award of monetary relief under

the Lanham Act must be compensatory, not a penalty," it does not follow "that a finding

of damages is a precondition of any monetary award."  Id. at 474.  Accord 5 J. McCarthy,

McCarthy on Trademarks and Unfair Competition § 30:59 (4th ed. 2010) ("The

unavailability of actual damages does not preclude an award of the infringer's profits.").

Rather, an accounting of the other party's profits may be "'based upon 1) unjust

enrichment, 2) damages, or 3) deterrence of a willful infringer.'"  Masters, 631 F.3d at

474 (assuming, without deciding, that willfulness remains a requirement under Section

1117(a) for violations of Section 1125(a)).  Accord 5 J. McCarthy, supra, § 30:59.  To

recover Safco's profits, Welcom need only show Safco's "sales."  15 U.S.C. § 1117(a).

Safco then bears the burden of proving "all elements of cost or deduction claimed."  Id.

Here, insofar as Welcom is not pursuing damages, the measure of Safco's profits

---

[20]     Reviewing in detail its prior cases, the Eighth Circuit explained that none of
its prior cases "binds us to require actual confusion to support an award for monetary
relief, including disgorgement of profits."  Id. at 473.  The court also stated that "the
actual confusion requirement" has a "limited application," suggesting that it applies only
with respect to damages as opposed to profits.  Id. at 472 (noting "distinction between an
award of a defendant's profits and an award of plaintiff's damages").

would presumably be based on either a theory of unjust enrichment or deterrence.  Safco

argues that unjust enrichment applies only in a trademark infringement action.  (Doc. No.

191, at 11-12.)  But any such argument is plainly untenable in light of the statute as well

as <u>Masters</u>.  Section 1117(a)–which, as part of "Subchapter III–General Provisions" of

Chapter 22 of Title 15, specifies the remedies generally applicable to violations of that

chapter and specifically authorizes a recovery of profits for a violation of section 1125(a).

<u>Metric & Multistandard Components Corp. v. Metric's Inc.</u>, 635 F.2d 710, 715 (8th Cir.

1980) (holding that Section 1117(a) "is the appropriate provision for determining the

monetary relief to be awarded under section 43(a) of the Act, 15 U.S.C. § 1125(a)").[21]

Finally, Safco also contends that disgorgement of its profits is not available as

Welcom could not prove willfulness or bad faith.  (Doc. No. 163, at 42-43.)  But "[t]he

Lanham Act specifically provides for the awarding of profits in the discretion of the judge

subject only to principles of equity."  <u>Roulo v. Russ Berrie & Co.</u>, 886 F.2d 931, 941 (7th

Cir. 1989).  "Other than general equitable considerations, there is no express requirement

that the parties be in direct competition or that the infringer willfully infringe the trade

dress to justify an award of profits."  <u>Id.</u>

Nevertheless, some courts had added a willfulness gloss to the statute.  <u>See, e.g.</u>,

<u>Tamko Roofing Products, Inc. v. Ideal Roofing Co.</u>, 282 F.3d 23, 36 n.11 (1st Cir. 2002)

(citing decisions of Second, Sixth and D.C. Circuits).  In light of the lack of statutory

---

[21]    The court came to this conclusion even before the 1988 amendments to
section 1117(a) that added violations "under section 1125(a) of this title" as a basis for
remedies under section 1117(a).

guidance or precision, various approaches to recovery of profits developed.  For example, the Second Circuit explained that although only the third of the three justifications for an award of the wrongdoer's profits expressly required willfulness–noting profits were recoverable "only if the 'defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the account is necessary to deter a willful infringer'"–a closer analysis of the law supports the conclusion that "under any theory, a finding of defendants' willful deceptiveness is a prerequisite for awarding profits." The George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992).

The First Circuit, in contrast, ruled that "an accounting of the defendant's profits *where the products directly compete* does not require fraud, bad faith, or palming off," but did not need to decide "whether 'willfulness' is a precondition for an accounting." Tamko Roofing Products, Inc., 282 F.3d at 36 & n.11 (explaining, however, that "when the rationale for an award of defendants' profits is to deter some egregious conduct, willfulness is required").

The 1999 amendments to the Lanham Act, however, changed the legal landscape. "Before 1999, section 1117(a) allowed recovery for, among other things, 'a violation under section 1125(a) of this title.'" Wildlife Research Center, 409 F. Supp. 2d at 1136. "Congress amended the language of section 1117(a) in 1999 to allow recovery for 'a violation under section [1125(a)] of this title, *or a willful violation* under section [1125(c)] of this title.'" Id. After additional amendments, the statute now "allows recovery for 'a *violation* under section 1125(a) or (d) of this title, or a *willful violation*

under section 1125(c).'" Id. at 1136 n.4 (emphases added).

Since the 1999 amendments, several circuits have ruled that a party establishing a violation of section 1125(a) need not also establish willfulness in order to recover profits or damages. Masters, 631 F.3d at 471 n.2 (characterizing current state of the law as a circuit split). The Third, Fourth and Fifth Circuits have held that the 1999 amendments clarify that willfulness is not required for a violation of Section 1125(a), but remains one of several relevant factors. Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 175 & n.13 (4th Cir. 2006); Banjo Buddies, Inc. v. Renofsky, 399 F.3d 168, 174-75 (3d Cir. 2005); Quick Tech., Inc. v. The Sage Group PLC, 313 F.23d 338, 348-49 (5th Cir. 2002). Furthermore, "[t]here is a division in this District as to whether willfulness remains a prerequisite to an accounting for profits under § 1117(a) for violation of § 1125(a)." American Ass'n For Justice v. The American Trial Lawyers Ass'n, 698 F. Supp. 2d 1129, 1147 n.23 (D. Minn. 2010) (noting rulings in Wildlife Research Center and in two unpublished decisions).[22]

This Court concludes that Section 1117(a) generally does not require willfulness, except where an award of the wrongdoer's profits would be based on the deterrence rational, but that willfulness is a relevant factor. But even so, the award of any remedy under Section 1117(a) is subject to this Court's equitable discretion and Welcom, even if it proves at trial that Safco's model 4049 pushcart falsely designates its geographic origin,

---

[22]     In Wildlife Research Center, the court, noting that the Eighth Circuit had not yet addressed the issue, agreed with the Third and Fifth Circuits that the 1999 amendments removed "any willfulness requirement for claims based on false or misleading advertising."  409 F. Supp. 2d at 1136.

would not be automatically entitled to recover Safco's profits even if willfulness would

be established.  Quick Tech., Inc. v. The Sage Group PLC, 313 F.23d 338, 349 (5th Cir.

2002).  Cf. Metric & Multistandard Components Corp. v. Metric's Inc., 635 F.2d 710,

715 (8th Cir. 1980) ("[T]he district court is given broad discretion to award the monetary

relief necessary to serve the interests of justice, provided it does not award such relief as a

penalty.").  And in light of the facts regarding the competitors' relative sales, Welcom's

apparent inability to establish a damages claim could likely be due, not to the inherent

problems of establishing causation and reliably measuring what sales it lost to Safco due

to the false designation of origin, but rather to the fact that Welcom–despite any false

designation–has not lost any sales and Safco has not gained any sales.

Moreover, Welcom's Lanham Act counterclaim is directed solely at Safco.  Yet

Safco does not manufacture the model 4049 pushcart and apparently does not label it as

having been manufactured in any particular country.  Rather, Safco imports the model

4049 through Thaler and Thaler, which also does not itself manufacture the model 4049,

purports to have it manufactured in Taiwan and labels them accordingly.  Thus, under

these particular circumstances, even if the designation of geographic origin is proved at

trial to be false, equitable considerations could preclude any Lanham Act remedy against

Safco.  Thus, Safco's motion for summary judgment on Welcom's Lanham Act

counterclaim is denied.

### L.    Safco's Motion To Exclude Defendants' Expert Witnesses and Testimony

Finally, Safco moves to exclude the testimony and opinions of H. Gwin Sanders

and Dr. Arthur Erdman, two individuals who have produced expert reports on behalf of

Welcom.  (Doc. No. 157.)  Safco contends that both reports are confined to impermissible

opinions on legal issues, namely, inventorship and the ornamental features of the '708

patent.  (Doc. No. 159.)  "Admission of expert testimony remains subject to the Rules of

Evidence and is committed to the discretion of the district court."  Sundance, Inc. v.

Demonte Fabricating Ltd., 550 F.3d 1356, 1363 (Fed. Cir. 2009).

Under Rule 702, "a witness qualified as an expert by knowledge, skill, experience,

training, or education" may testify regarding "scientific, technical or other specialized

knowledge" if such knowledge "will assist the trial of fact to understand the evidence or

to determine a fact in issue."  Fed. R. Evid. 702.  But such testimony, "in the form of an

opinion or otherwise," is permissible only "if (1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and (3)

the witness has applied the principles and methods reliably to the facts of the case."  Id.[23]

### 1.    H. Sanders Gwin

Welcom has produced the expert report of H. Sanders Gwin, a patent lawyer,

providing an opinion on how a patent is obtained, the legal principles of inventorship and

who invented the subject matter claimed in the '708 patent.  (Doc. No. 183, Ex. 303.)

Safco contends that an expert opinion on issues of law is improper and

unnecessary.  (Doc. No. 159, at 1.)  Welcom argues that Mr. Gwin's opinion on

---

[23]    Rule 702 was amended in 2000 "in response to Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), and to" other cases "including Kumho Tire
Co. v. Carmichael," 526 U.S. 137 (1999).  Fed. R. Evid. 702 adv. cmte. notes.

inventorship is appropriate because it "does not expect to necessarily offer Mr. Gwin's testimony on the law," which Mr. Gwin addresses to provide context for his opinion on the facts. (Doc. No. 180, at 5-6.)

The Court recognizes that there is little, if any, role for expert testimony regarding legal issues in patent actions. See, e.g., Nutrition 21 v. United States, 930 F.2d 867, 871 n.2 (Fed. Cir. ) ("An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all.") (citing Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1562 (Fed. Cir. 1988) ("[A]n expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling.")). Mr. Gwin's report is essentially a legal treatise coupled with an analysis of the factual record regarding Chang and Jian's contributions to the design claimed in the '708 patent. Neither is necessary, or appropriate, here. Accordingly, the Court grants Safco's motion in part, that is, insofar as it seeks to exclude the opinion and testimony of Mr. Gwin.

### 2.    Dr. Arthur G. Erdman

With respect to Dr. Erdman's opinion and proposed testimony, however, the Court denies the motion to exclude. Safco argues that "Dr. Erdman's proffered testimony is wholly unrelated to his technical expertise." (Doc. No. 159, at 2.) Safco asserts that Dr. Erdman is neither "a product design expert nor a person of ordinary skill in the art." (Doc. No. 187, at 4.) Granted, Dr. Erdman, while a mechanical engineer, is not a designer of pushcarts. But that level of technical or scientific tailoring is not required by Rule 702. If a proposed expert possesses expertise in the general field at issue that could

be helpful to the jury, the jury is entitled to hear that testimony and accord it whatever weight it deems appropriate.

Safco also contends that Dr. Erdman's testimony is "directed to a legal issue: claim construction." (Doc. No. 159, at 7.) Safco further argues that no such construction is necessary here in light of the Federal Circuit's decision abandoning the point of novelty test for design patents. (Doc. No. 187, at 4.) But, as discussed above, this court is not presently addressing infringement, but rather inventorship, and the question of who conceived of which particular ornamental feature requires that this Court first identify the ornamental, as opposed to the functional, features of the '708 patent. Moreover, although this Court has issued its claim construction, the jury will decide the question of infringement and various factual questions underlying the inventorship issue. Dr. Erdman's discussion of the distinction between the patentable ornamental features of a design and the non-patentable functional features could likely assist the jury in resolving both inventorship and infringement issues. Accordingly, the court denies Safco's motion insofar as it seeks to exclude the opinion and testimony of Dr. Erdman.

## III.   CONCLUSION

This design patent infringement action cannot be resolved on summary judgment because, at bottom, the real dispute is one of inventorship, with the manufacturer of the allegedly-infringing product claiming to have invented (or co-invented) the claimed subject matter of the '708 patent. The relevant issues of inventorship–essentially whether Chang or Jian, or both, conceived of the claimed design–turn largely on factual issues,

including the credibility of the two purported inventors, that cannot be decided at this juncture.  Although the patentee is entitled to a presumption of validity that encompasses the issue of inventorship, the presumption is not irrebutable and does not constitute substantive evidence.  Welcom presently has raised sufficient issues of material fact, such that at trial the fact-finder could conclude that Welcom has rebutted, based on clear and convincing evidence, the presumption of inventorship.  But Welcom has not yet shown that there are no genuine issues of material fact such that this Court could grant Welcom's motion for summary judgment.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's motion for summary judgment [Doc. No. 161] is **GRANTED IN PART** (insofar as it seeks a judgment on Defendants' invalidity defenses of anticipation and obviousness and on its affirmative defenses of laches, equitable estoppel and waiver) and **DENIED IN PART** (insofar as it seeks a judgment of infringement and "validity" and a judgment on Welcom's counterclaim under the Lanham Act as well as its inequitable conduct defense);

2.      Plaintiff's motion to exclude testimony and opinions [Doc. No. 157] is **GRANTED IN PART** (insofar as it seeks to exclude the opinions and testimony of Mr. Gwin) and **DENIED IN PART** (insofar as it seeks to exclude the opinions and testimony of Dr. Erdman); and

3.      Welcom's motion for claim construction, summary judgment of patent

invalidity, and for summary adjudication of co-inventorship [Doc. No. 166] is

**GRANTED IN PART** (insofar as it seeks claim construction for purposes of

inventorship) and **DENIED IN PART** (insofar as it seeks a judgment of invalidity for

derivation or for failure to name the correct inventors).

Dated:   July 1, 2011                                    s/ Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge